**FIRST DIVISION**
**PHIPPS, P. J.,**
**BOGGS AND MERCIER, JJ.**

**NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**March 24, 2016**

# In the Court of Appeals of Georgia

A15A1778. HILL v. JACKSON, et. al.

MERCIER, Judge.

This appeal is from the grant of summary judgment to several defendants in a wrongful death suit filed on behalf of plaintiff/appellant Gabrielle Hill ("Appellant"), the minor child of Richard Willie Hill, Jr. ("Hill"), against Fulton County Sheriff Theodore Jackson, Nitosha Riley, Latessa Robertson, Milton Weaver, Charles Martin, Andrea Thomas (collectively, the "Fulton County defendants"), Charlene Dumas , Correctional Medical Associates, Inc. ("CMA"), and Stephanie Bennett.[1] The suit arises from Hill's suicide, which occurred while he was in custody in the Fulton County jail.

---

[1]An additional defendant, Wanda Murray, was dismissed from the suit.

Appellant sought damages from the defendants claiming that "they negligently failed to take steps to prevent Hill's suicide despite their knowledge of the active risk of suicide." The complaint averred two causes of action for wrongful death: (1) Hill died as a direct and proximate result of the negligent failure of the Fulton County defendants (and two parties not involved in this appeal) to comply with an order from the Superior Court of Fulton County placing Hill on suicide watch, to perform their duties pursuant to the laws of the State of Georgia, and to comply with the policies and procedures of the sheriff's departments of Fulton County and Hall County; and (2) Hill died as a direct and proximate result of the negligent failure of the defendants to take any steps to secure medical evaluation and treatment for Hill, and his death was a result of the breach by Jackson of his ministerial duty to provide medical treatment and care, and a direct and proximate result of the negligent conduct in which Dumas engaged, for which she and her employer CMA are responsible.

Riley, Robertson, Weaver, Martin, and Thomas, who were employees of the Fulton County Sheriff's Office on the date of Hill's suicide, were sued only in their individual capacities. Jackson was the Sheriff of Fulton County at the time of Hill's death. The complaint, as amended, does not state in what capacity Appellant sued Jackson, but because Appellant's pleadings in the trial court and on appeal make

2

argument only about Jackson's individual liability and about qualified immunity, and do not argue that Jackson was being sued in any official capacity, we surmise that he was being sued only in his individual capacity. See *Jobling v. Shelton*, 334 Ga. App. 483, 486 (2) (779 SE2d 705) (2015) ("[I]n determining the capacity in which a defendant is sued, courts should look to the complaint and the course of the proceedings.") CMA contracted with the Fulton County Sheriff's Office to provide medical services to inmates, and Dumas, a medical assistant, was an employee of CMA.

All of the defendants moved for summary judgment. In three separate orders, the trial court granted summary judgment to all of the defendants involved in this appeal.[2] Appellant appeals the grant of summary judgment to the Fulton County defendants, CMA and Dumas, arguing that the trial court erred by: (1) holding that policies directing Fulton County employees to take specific actions under specific circumstances did not establish ministerial duties; (2) resolving disputes of material fact in favor of the movants; (3) failing to adjudicate whether Jackson's failure to provide medical treatment for inmates such as Hill constituted a breach of a statutory

---

[2] The superior court also granted summary judgment to defendant Bennett; Appellant does not appeal that judgment.

3

ministerial duty; (4) holding that Riley and Robertson are entitled to qualified immunity; (5) holding that CMA and Dumas had no duty of care to Hill while he was in the custody of Hall County or when he was returned to Fulton County; and (6) holding that there was no evidence to support a finding of proximate cause as to CMA and Dumas. For the reasons that follow, we affirm the grant of summary judgment to Jackson, Martin, Thomas, Robertson, CMA and Dumas; we reverse the grant of summary judgment to Weaver and Riley.

> Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. A de novo standard of review applies to an appeal from a grant of summary judgment, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant.

*McKissick v. Giroux*, 272 Ga. App. 499 (612 SE2d 827) (2005) (citations and footnotes omitted). See OCGA § 9-11-56 (c). "[A] grant of summary judgment must be affirmed if it is right for any reason, whether stated or unstated in the trial court's order, so long as the movant raised the issue in the trial court and the nonmovant had a fair opportunity to respond." *Anderson v. Jones*, 323 Ga. App. 311, 312 (n. 2) (745 SE2d 787) (2013) (citation omitted).

> [A] defendant who will not bear the burden of proof at trial
> need not affirmatively disprove the nonmoving party's
> case, but may point out by reference to the evidence in the
> record that there is an absence of evidence to support any
> essential element of the nonmoving party's case, and . . .
> the nonmoving party cannot then rest on its pleadings, but
> rather must point to specific evidence giving rise to a
> triable issue.

*Cox Enters. v. Nix,* 274 Ga. 801, 804 (2) (560 SE2d 650) (2002) (citation omitted). "Guesses or speculation which raise merely a conjecture or possibility are not sufficient to create even an inference of fact for consideration on summary judgment." *Heath v. Rush*, 259 Ga. App. 887, 888 (578 SE2d 564) (2003) (citation and punctuation omitted).

Viewed in the light most favorable to Appellant (as non-movant), the record shows the following. Hill was in a romantic relationship with K.T. , and after K.T. ended the relationship, Hill went to her place of employment with a gun. Hill later went to K.T.'s home and fired shots into her car. Hill was charged with aggravated assault and taken to the Fulton County jail on May 21, 2010.

Fulton County and the Sheriff's Office had a written agreement with Hall County, pursuant to which the Hall County jail housed Fulton County inmates to

avoid overcrowding in Fulton County's jail. Hill was "outsourced" to Hall County in July 2010. On September 7, 2010, while Hill was still housed in Hall County, a Fulton County Superior Court Judge issued an order (the "suicide watch order") directing that Hill be placed on suicide watch and in protective custody.

There is significant disagreement among the parties as to what happened once the suicide watch order was issued. Because we view the facts in the light most favorable to Appellant (see *McKissick*, supra), in instances where there is conflicting evidence of the facts, we consider the evidence that is most favorable to Appellant's position. The suicide watch order was faxed to the records department at the Fulton County jail on September 7, 2010. Robertson and Riley were civilian employees at the jail. Robertson worked as a "distributor," and was responsible for faxing orders to various divisions in the Sheriff's Office. Robertson faxed a copy of the suicide watch order to Lieutenant Thomas in the classification department, to the outsource division, the watch commander's office, and the medical section, but not to the transfer section.

Riley worked as a disposition writer and a distributor in the records department at the Fulton County jail. On the day that the suicide watch order was received, Riley was working as a "writer." In this job, she received folders for individual inmates

6

from the distributor, which contained court orders, and she was responsible for taking the information contained in new orders and putting it on inmate information cards, then comparing court documents with the information written on the inmate information cards to ensure the accuracy of the information prior to the jail folders being passed to a person who would enter the information in the computer system. On the date that the suicide watch order was faxed to the records department, Riley wrote information about Hill's bond on the card, but did not write anything on the card about the suicide watch order. The suicide watch order was faxed to the Hall County Sheriff's Office by Hill's attorney. The Hall County jail maintained Hill on suicide watch.

Martin, a deputy with the Fulton County Sheriff's Office, was in charge of "outsourcing" and was therefore responsible for communicating with other sheriff's offices and agencies about inmates who were being housed in other jails. His responsibilities included initiating a mental and physical health screening process to determine whether inmates were eligible to be housed in other jails. Inmates were screened by the medical section to determine if they could be outsourced to other facilities, and Martin would consult with Dumas of CMA about these decisions.

When Dumas consulted with Martin about an e-mail she received from a nurse at the Hall County jail regarding Hill being suicidal, Martin told Dumas that Hill should be observed in Hall County until Martin heard something different from the courts. Martin stated that he could not have arranged for Hill to be returned to the Fulton County jail until he received approval from the medical staff at the Fulton County jail because Hill was on suicide watch in Hall County.

A copy of the suicide watch order was sent to the classifications division on September 7, 2010. On September 14, 2010, Sergeant Baines of the Hall County Sheriff's Office sent an e-mail to Martin, referencing the suicide watch order and stating that Hill needed to be sent back to the Fulton County jail because he refused to take his medication, and the doctor in Hall County said that he likely required commitment to a hospital or treatment facility. It further provided, "there is no rush on this so it will give time to make arrangements . . . [the lieutenant] wanted me to give you a heads up so you can put it in motion." Martin responded by e-mail, stating that he would "get things in motion" and "keep [them] posted."

Between September 14, 2010 and September 16, 2010, Martin spoke to Thomas, a lieutenant in the classifications division of the Fulton County jail,

regarding Hill, and Thomas contacted CMA. Thomas did not take any steps to have Hill returned to Fulton County for treatment or evaluation.

On September 16, 2010, Hill's name appeared on the "pull sheet," which is a list of inmates who would be going to court in Fulton County that day. There was no indication on the list that Hill was subject to suicide watch. At 7:49 a.m. that day, Baines (Hall County) e-mailed Martin, telling him that Hill was on the list to go to court in Fulton County that day, and asking if Hill would be coming back to Hall County or staying in Fulton County after the court appearance. Martin responded, "To my knowledge nothing has changed so he should be returning to you tonight."

On the morning of September 16, 2010, Bennett and other Hall County deputies transported Hill from the Hall County jail to the Fulton County jail. Baines told Bennett to give the suicide watch order to a sergeant at the Fulton County jail. Weaver was awaiting the Hall County deputies' arrival at the Fulton County jail. Weaver did not know that Hill was on suicide watch. Upon arriving at the Fulton County jail, Bennett spoke to Weaver and showed him the suicide watch order, and told him that Hill needed to be kept separately because of the order. Weaver asserts that Bennett told him only that Hill was supposed to be kept separately from other inmates, not that he was on suicide watch. Weaver placed Hill in an attorney's booth

9

in an effort to keep him separate, and removed his handcuffs and shackles. Weaver did not take any further steps to protect Hill from self-harm. He left Hill in the booth and went to a different part of the jail to attend to other inmates.

Hightower, a Fulton County deputy who was assisting Weaver, looked into the window of the attorney booth and saw that Hill was not wearing pants. When he attempted to open the door he could not, because Hill's body was pressed against the door. Upon entering the booth, jail staff discovered that Hill had tied his pants around his neck and hanged himself.

1. *Weaver, Martin, and Thomas*. The trial court found that Weaver, Martin and Thomas were entitled to official (or qualified) immunity[3] and granted summary judgment to them on that basis.

---

[3]As recognized in Presiding Judge Barnes's concurring opinion in *Tattnall County v. Armstrong*, 333 Ga. App. 46 (775 SE2d 573) (2015), the terms "official immunity" and "qualified immunity" are used interchangeably in Georgia case law to refer to the type of immunity that sometimes shields government employees from individual liability; the term "official immunity" creates confusion with the defense of sovereign immunity. *Tattnall County,* supra at 52-53. We therefore adopt Judge Barnes's suggested nomenclature and hereinafter refer to individual-capacity immunity as "qualified immunity," regardless of the term used in applicable pleadings, orders, or cited cases.

(a) Appellant's first contention with regard to Weaver, Martin and Thomas is that the trial court erred by holding that the Fulton County Sheriff's Office's policies did not establish ministerial duties for them. We find that the trial court erred as to Weaver, but did not err as to Martin and Thomas.

> The doctrine of . . . qualified immunity offers public officers and employees limited protection from suit in their personal capacity. . . .[It] protects individual public agents from personal liability for discretionary actions taken within the scope of their official authority, and done without wilfulness, malice, or corruption. Under Georgia law, a public officer or employee may be personally liable only for ministerial acts negligently performed or acts performed with malice or an intent to injure.

*Cameron v. Lang*, 274 Ga. 122, 123 (1) (549 SE2d 341) (2001) (citation and punctuation omitted). See also Ga. Const. of 1983, Art. I, Sec. II, Par. IX (d).

> [A] ministerial act is commonly one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty. A discretionary act, however, calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed.

11

*Jobling*, supra at 487 (2) (citation omitted). A ministerial duty may be established in a variety of ways, including by written or unwritten policy, a supervisor's directive, or by statute. Id. When a policy requires a public official to exercise discretion in its implementation by determining if the necessary prerequisite condition to the ministerial act exists, the policy does not require the performance of a ministerial duty and qualified immunity shields the official from individual liability. *Grammens v. Dollar*, 287 Ga. 618, 620-621 (670 SE2d 555) (2008).

When a party moves for summary judgment on the basis of qualified immunity, that party bears the burden of establishing that he was entitled to the protection of said immunity. *Jobling*, supra at 488 (2) (a). Once this burden is carried and this prima facie showing is made, the burden to produce evidence shifts to the non-moving party to come forward with rebuttable evidence sufficient to show that a genuine issue of fact exists with regard to whether the defendant breached a ministerial duty. *Jobling,* supra at 488 (2) (a).

(i) *Weaver*. Appellant argues that the suicide watch order established ministerial duties for Weaver. We agree. Jackson testified that all personnel of the Fulton County Sheriff's Office were required to follow applicable policies and procedures if a court order directed that an inmate be placed on suicide watch.

12

According to Fulton County Sheriff's Department Written Directive 1.4, all deputies and detention officers are required to "execute . . . orders of the court. . ." Appellant contends that Weaver failed to comply with Jail Bureau Policies and Procedures, Number 1500-18, which applies to all jail bureau personnel, and provides for special monitoring of suicidal inmates. That policy states that "Special Risk Inmates are those . . . who pose an immediate threat or risk of harm to themselves or others and may include suicidal . . . persons whose behavior creates an immediate concern for the personal safety of the inmate/staff." It provides that "[s]uch persons shall be placed under close supervision by direction of the medical staff or Chief Jailer only." Further, "observation of those inmates shall include documented physical sight checks by a Deputy/Detention Officer or medical staff member at irregular intervals which do not exceed fifteen (15) minutes," and "inmates considered to be suicidal will be under direct visual observation by a Deputy/Detention Officer twenty-four (24) hours a day as directed by appropriate medical staff . . . the Deputy/Detention Officer shall be in a position to observe the inmate on a continual basis and have the cell door key in his/her possession at all times to ensure prompt access."

Appellant also points to Fulton County Jail Health Services Policy #J-G-05, which provides that "individuals placed on suicide precautions will be routinely

13

housed in single cells on the Acute Psychiatric Unit," and that certain procedures and restrictions "*will* routinely apply" (emphasis added), including, among other things, staff will conduct body searches and confiscate all materials that could be used for self-harm; inmates will wear only paper gowns; inmates may not have blankets or linens; and inmates will be subject to visual observation by clinical and correctional staff 24 hours per day with monitoring by correctional staff every 15 minutes, staggered, and hourly by nursing staff.

The suicide watch order in this case dictated that the Fulton County Sheriff's Office place Hill on suicide watch. Policy #J-G-05 lays out simple, absolute and definite tasks that must be performed when individuals are placed on "suicide precautions." There is no evidence that sheriff's office employees have the latitude or authority to deviate from these procedures. The prescribed tasks are "simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty;" they do not call for deliberation or judgment. *Jobling*, supra 487 (2). Therefore, the duties created thereby were ministerial, rather than discretionary, and the trial court's grant of summary judgment to Weaver on the grounds that Weaver's duties were discretionary and he was

14

therefore shielded from negligence claims by qualified immunity was erroneous. See *Cameron*, supra. We therefore reverse the grant of summary judgment to Weaver.

There is conflicting evidence about whether Weaver was notified of the suicide watch order, triggering the duties created by policies applicable to him. Bennett testified that she showed him the suicide watch/protective custody language in the order when she delivered Hill to the Fulton County jail. Weaver testified that Bennett told him merely that Hill was to be separated from other inmates. This factual dispute does not change the analysis of Weaver's entitlement to summary judgment, as it was granted by the trial court on the erroneous finding that the duties at issue were discretionary.

(ii) *Martin.* Appellant argues that two policies established ministerial duties applicable to Martin. First, Appellant points to the "Manual of Policies and Procedures for Health Services," Policy #J-A-08. This policy states that "CMA's medical staff and [the Fulton County jail's] custody staff (including the classifications office staff) will communicate about inmates with special needs which may have an impact on housing, security, work assignments, disciplinary measures and transfers to and from institutions."

15

Secondly, Appellant points to Fulton County Sheriff's Office policy number 2100-01, which addresses the inmate classification system (the "classification policy"). The classification policy states that "[t]he Jail Bureau provides for separate management of the following categories of inmates . . . Inmates with special problems. . . [including] suicide risks. . . ." It further states that "[a]ll staff shall take immediate action in situations that pose a danger to persons, property or the institution. These situations include . . . possible suicide or self-inflicted harm." The classification policy goes on to explain that in these situations, "[s]taff actions will include immediate control and supervision, referral to the appropriate command deputy/detention officer and specialty resource, and input (written reporting) for reclassification." It notes that reclassification assessment "will often require a referral and an examination or evaluation by medical or mental health staff." Further, it directed that "all jail staff, other support employees and clerical employees having any knowledge or information that would affect inmate classification codes will record and report this information (and any changes) to the classification staff daily."

Appellant contends that Martin failed to comply with these policies. After Dumas told him about the suicide watch order on September 8, 2010, she argues, Martin did not take immediate action to record and report to the classification staff

16

that Hill was suicidal, and, instead of conferring with medical staff, Martin told Dumas that Hill should stay in Hall County. Further, Appellant argues that when Martin was notified by Hall County Deputy Baines that Hill needed to be returned to Fulton County because of his condition, Martin failed to relay the information to anyone in the medical division or to the classification staff.

The language in these policies calls for personnel to exercise their discretion. For example, Policy #J-A-08 simply says that medical and custody staff will communicate about inmates with special needs that *may* impact various aspects of managing the jail. The policy presents no specific circumstance that triggers specific action, see *Jobling*, supra at 487 (2), and does not dictate the extent to which the staff should communicate regarding such special needs. The cited portions of the classification policy require action in "situations that pose a danger to persons, property or the institution," and where a staff member has "information that would affect inmate classification codes." These policies require that staff exercise discretion in determining whether the prerequisite condition exists to exercise a duty, and are therefore not ministerial. *Grammens*, supra. We affirm the grant of summary judgment to Martin.

17

(iii) *Thomas*. Appellant argues that the same policy provisions applicable to Martin created ministerial duties that applied to Thomas. We disagree for the reasons set forth in Division (1) (a) (ii) above. In addition to those duties, Appellant notes that the classification policy also provides that "[i]mmediate medical or mental health attention may also be deemed necessary as a result of an inmate's mention of suicide or of an incident where an inmate's abnormal behavior, medical/mental complaint, or suspected or obvious injury appears emergent. Medical or mental health staffs are contacted by phone or radio for an immediate evaluation."

Appellant argues that Thomas failed to take required action as required by this policy when she learned of the suicide watch order, and when she learned that Hall County Deputy Baines contacted Martin about returning Hill to the Fulton County jail as a result of his condition. The policies pointed out by Appellant do not create ministerial duties applicable to Thomas. The cited policy language says that "immediate medical or mental health attention *may* also be deemed necessary." The language regarding immediate contact with medical staff is in the context of this possible need. On its face, this language creates a discretionary duty, requiring personnel to exercise judgment. See *Jobling,* supra at 487 (2). We therefore affirm the grant of summary judgment to Thomas.

18

(b) Appellant also contends that the trial court erred by resolving substantial and outcome determinative disputes of material fact in favor of Weaver and Martin. Specifically, she points to disputed facts regarding whether Bennett showed Weaver the suicide watch order, and regarding whether Martin required approval from CMA in order to have Hill brought back to the Fulton County jail. As we are reversing the grant of summary judgment to Weaver on the grounds set forth in Division (1) (a) (i), we need not examine this enumeration of error with regard to Weaver. Because we are affirming the grant of summary judgment to Martin in Division (1) (a) (ii) on the grounds of qualified immunity where the applicable policies cited by Appellant involved discretionary duties, the factual issue of whether Martin needed approval to have Hill brought back to the jail is not material.

2. *Robertson and Riley*. The grant of summary judgment to Robertson and Riley was also based on the court's finding that they were entitled to qualified immunity.

(a) Appellant argues that the court erred in determining that Robertson's and Riley's duties were not ministerial. We agree with Appellant as to Riley, but disagree as to Robertson.

(i) *Robertson*. With regard to Robertson, Appellant points to an unwritten, "overarching policy for someone in her position." She argues that when a distributor in the records division received a court order, he or she was to forward it to the other divisions of the jail. Specifically, she argues that the records division was responsible for distributing orders to the transfer division, and that Robertson did not have the discretion to decide whether the order should be sent to a particular division of the jail. Unwritten policies can establish ministerial duties where they require specific action under specific circumstances. See *Cooley v. Bryant*, 331 Ga. App. 718, 720-722 (1) (771 SE2d 411) (2015).

To demonstrate the existence of the alleged ministerial policy, Appellant points to deposition testimony from Weaver. His relevant testimony establishes that generally, if a court order pertaining to a particular inmate comes into the jail, a copy of that order needs to go to the transfer division; that if "the person" ("whoever receives the order") does not forward the order to the transfer division, then the transfer division "can't get it to the court"; that copies of orders are always faxed to the transfer division to keep certain people separated from one another; that if an order comes in "it will go to Records, Records will get a copy, [Weaver gets] a copy, downtown get [sic] a copy, everybody get [sic] a copy, and that's kind of basically

20

generally how it works"; and that "Classification, Transfer, all the sections of the jail should get a copy of any order that pertains to any particular individual."

Appellant also points to deposition testimony from Robertson that confirms that she had a written job description that set forth a distributor's responsibilities, including "faxing a copy of all transport orders; keep separate orders; medical orders and special conditions orders to the appropriate areas." When asked if she had authorization to distinguish between the divisions of the jail to which orders are distributed, and if she had the authority to decide which sections of the jail received a suicide watch order, Robertson said she did not. However, Robertson also explained that her practice of sending orders to the transfer division only if they dealt with transport matters was the result of the instructions she received from supervisors.

The written policy applicable to Robertson's job provides that orders should be sent to the "appropriate" areas. Although Robertson testified that she did not have discretion to make decisions about what those appropriate areas were, she testified about how she was trained and what the normal procedure was, as explained by her supervisor. Appellant fails to point to a specific policy, written or unwritten, that creates a ministerial duty specifically requiring Robertson to send a copy of suicide watch orders to the transfer department. Rather, the normal practice involved some

21

analysis of the document. See *Grammens*, supra. The trial court did not err in granting summary judgment to Robertson.

(ii) *Riley*. Appellant argues that Riley, working as a disposition writer in the records division of the jail on September 7, 2010, was required to post inmate-specific information from incoming court orders onto the inmate's information card. On appeal, Appellant points to the alleged policy of the records department regarding the transfer of information, as described in Riley's testimony. Riley testified that one of the duties assigned to a disposition writer, as contained in a written summary of records department job duties, is to compare court documents with the information written on an inmate's information card to ensure that the information is correct prior to the inmate's folder being passed on to the personnel who enter the data into the computer system. The summary of job duties also provides that "[p]ersonnel entering court dispositions [sic] primary function is to ensure whatever is written on the [inmate's information] card from court is entered into the mainframe system."

When asked, "So when the writer pulls [an inmate's folder] off the cart, the writer's job then is to take the information that is contained in the new orders and put it onto the [inmate's information card]?", Riley answered affirmatively. Appellant also points to Riley's testimony that she did not have discretion to not copy

22

information from an order in the inmate's folder onto the inmate's information card. Riley testified that the only requirement of which she was aware specifically regarding the handling of a suicide watch order was to fax it to everyone to "have everybody on alert," and that certain things were only faxed to other departments, while other things were written on the card; but this is contradicted by her own testimony as previously described.

Riley's duty to copy information from court orders onto an inmate's information card was simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty. *Jobling*, supra at 487 (2). Thus, Riley was not entitled to summary judgment. See *McKissick*, supra. We therefore reverse the grant of summary judgment as to Riley. Because we reverse the judgment entered in her favor on this basis, we need not address Appellant's contention that the trial court erred in resolving a substantial and outcome determinative dispute of material fact in Riley's favor.

(b) In her fourth enumeration of error, Appellant contends that the trial court erred by holding that Riley and Robertson are entitled to qualified immunity because the complaint in this case failed to allege that the defendants acted with malice or

intent to injure. Appellant argues that the failure to allege these theories cannot be the basis for a grant of summary judgment. This enumeration is without merit.

The complaint only asserts claims based on the alleged *negligence* of the defendants. In the context of individual liability and qualified immunity, where there "has been no allegation of actual malice or intent to injure[,]. . .suit. . . can be sustained only if [the defendant's] actions were in the performance of a ministerial duty, and not a discretionary one." *Cameron*, supra. The trial court held that Riley and Robertson were entitled to qualified immunity because it found that their duties were not ministerial.

3. *Jackson*

Appellant contends that the trial court erred in granting summary judgment to Jackson while failing to adjudicate whether Jackson's alleged failure to provide medical treatment for inmates constituted a breach of a statutory ministerial duty. Appellant argues that she "proved that . . . Jackson's agreement with CMA eliminated any responsibility on CMA's part for the medical care of prisoners like Hill who were not 'in the actual physical custody of the Fulton County Jail.'" The court noted in its order that "Appellant further alleges Hill died as a proximate result of the breach by

24

Defendant Jackson of his ministerial duty to provide medical treatment and care," but the court never specifically addressed this claim in its grant of summary judgment.

Nonetheless, this contention does not present a reversible error. Jackson did not dispute that he had a ministerial duty to provide medical care, but argued that Appellant's claims for negligence could not stand where the evidence showed that he fulfilled his duty by providing for medical care for inmates through the contract with CMA. Appellant argues that there was *no* system in place at the Fulton County jail to make decisions to provide for non-routine medical treatment, but the testimony demonstrates that the usual practice was to return inmates to Fulton County's jail if a non-routine matter arose that Hall County did not agree to address, or to reimburse Hall County for the non-routine treatment. Here, Jackson pointed to proof that he had fulfilled his duty, and Appellant did not present evidence to demonstrate a triable issue as to Jackson's alleged breach of duty. *Cox Enters.*, supra; see *Anderson*, supra.

As Jackson attested, as Sheriff he was not personally involved in the day-to-day operations of inmate management. However, he provided for required services through contracts and policies. While the outcome of Appellant's claim may have been different if Jackson were sued in his official capacity, the claim against him in

25

his individual capacity was properly adjudicated by the trial court and we affirm the grant of summary judgment.

4. *CMA and Dumas*

The trial court granted summary judgment to Dumas and CMA on the basis that Appellant failed to demonstrate genuine issues of material fact on two elements of the claim against them, namely, the requirements (1) that they deviated from the applicable standard of care, and (2) that the deviation was the proximate cause of the injury. Appellant contends that the trial court erred by holding that CMA and Dumas breached no duties with regard to Hill under any standard of care, and by finding that there was no genuine issue of material fact as to proximate cause. We disagree with Appellant as to the issue of breach of duty and affirm on this basis.

In support of her argument that the trial court erred in finding that CMA and Dumas breached no duty to Hill, Appellant contends that the CMA contract did not exclude outsourced inmates; that regardless of implied contractual limitations, CMA and Dumas assumed a duty of care to Hill; and CMA took no steps to care for Hill when he was present at the Fulton County jail on September 16, 2010.

(a) The essential elements of a medical negligence claim are "(1) the duty inherent in the doctor-patient relationship; (2) the breach of that duty by failing to

26

exercise the requisite degree of skill and care; and (3) that this failure be the proximate cause of the injury sustained." *Zwiren v. Thompson*, 276 Ga. 498, 499 (578 SE2d 862) (2003). The parties' dispute regarding CMA's and Dumas's duty, or absence of duty, to Hill seem to conflate the first and second elements. The parties point to CMA's contract with Fulton County. Dumas and CMA allege that the contract does not explicitly require provision of services to outsourced inmates, and so they are entitled to summary judgment. Appellant argues that the contract does not exclude the provision of such services, and a dispute of material fact thus exists.

CMA and Dumas point to testimony from George Herron, the director of medical services for Fulton County, and Joy Church, the representative for CMA. Church testified that CMA was only responsible for providing medical and mental health services to inmates who were physically housed at the Fulton County jail. Herron testified that while an inmate was outsourced to another county's jail, the other facility had responsibility for the inmate's medical care. He further testified that Fulton County medical policies and procedures did not apply to outsourced inmates.

Appellant argues that there is evidence that CMA staff was responsible for communicating with Hall County medical staff regarding the condition of outsourced prisoners and arrangements for their return to Fulton County. She cites testimony

27

from Deputy Baines of Hall County that he knew how the Fulton County jail operated, and after the medical departments from Hall and Fulton Counties conferred about an inmate, Fulton County's medical staff would contact Martin to tell him to return the inmate to Fulton County's jail. This testimony speaks to the regular practice between the Hall County and Fulton County jails, and is not given by a party with first-hand knowledge of CMA's contractual obligations.

Appellant also points to testimony from Martin about Dumas's involvement in the process. In discussing the e-mail that he received from Baines regarding Hill's suicidal state, Martin testified "If I got this type of information, . . . I. . . talked to Dumas about it. And once I talked to Dumas about it, it's her responsibility, then to get with her superiors as to how we're going to bring this . . . inmate back for an evaluation." He further testified that he communicated to Dumas what Hall County's doctor said, "for her to tell me what our doctors say. And whatever their decision is, that's when I move the inmate."

Appellant further argues that testimony from Jackson supports the proposition that CMA personnel were required to be involved in making medical decisions for outsourced prisoners. During his deposition, Jackson was asked, "Was it your understanding, nonetheless, that because of its agreement with Fulton County and the

28

sheriff's department, that CMA personnel would be involved in making medical decisions for those outsourced prisoners?" He responded, "Well, based on this [memorandum of understanding], they would have to be, because the agreement we had with Hall County, non-routine, would be, either treated by Fulton County or approved by Fulton County." Appellant argues that Jackson indicated that his department's policies applied to outsourced inmates:

> Q: The sheriff's department policy, then, as I understand it, was that the bureau, jail bureau was to provide for the continuity of healthcare and emergency care from admission to discharge, correct?
> A: Yes.
> Q: And this policy applied, did it not, to outsourced prisoners?
> A: It doesn't specifically say that.
> Q: In your opinion, did it encompass, that is to say, the policy that the jail bureau shall provide for the continuity of healthcare and emergency care, as I just recited, did that include outsourced prisoners?
> A: It doesn't specifically say that. We can assume it does.
> Q: Is it your belief that it should have?
> A: Yes.
> Q: And should have applied to Richard Hill?
> A: Yes.
> ...
> Q: So am I correct in understanding, then, that the policy of your department was that inmates with mental health disorders were to be provided with the appropriate medication and counseling intervention?
> A: Yes.
> Q: And that the policy applied to outsourced prisoners?
> A: Yes.
> Q: And applied to Richard Hill?
> A: Yes.

29

Jackson's testimony serves only to establish that it was the policy of the Sheriff's Office that inmates were to be provided care, but does not demonstrate that CMA's contract encompassed outsourced inmates. Nothing in the testimony cited by Appellant creates a triable issue as to question of whether CMA's contract applied to outsourced inmates.

Moreover, the contract itself clearly establishes the duties of CMA and its employees. It provides that

> Inmate Mental Health Services are intended only for those inmates in the actual physical custody of the Fulton County Jail facilities . . . [CMA] shall bear no responsibility for any other inmates . . . unless Sheriff's Office agrees to provide Inmate Mental Health Services to inmates housed in another jail or other facility pursuant to an interagency agreement or intergovernmental agreement, in which case [CMA] and Sheriff's Office will mutually determine, in good faith, whether to reallocate [CMA's] resources to the other jail or facility or whether [CMA] will be asked to add additional resources, at additional cost, at the other jail or facility. . . . Except as herein provided, inmates not in the physical custody of the Fulton County jail facilities will not be deemed to be inmates. . . . Except as herein provided, inmates in the custody of other penal institutions or jails at the request of the County shall likewise be excluded from the daily population count and it shall not be [CMA's] responsibility, either to furnish or to pay the costs of, Inmate Mental Health Services to those inmates.

"Contract disputes are particularly well suited for adjudication by summary judgment because construction of contracts is ordinarily a matter of law for the court." *Elwell v. Keefe*, 312 Ga. App. 393, 394-395 (718 SE2d 587) (2011). Here, the agreement excludes outsourced inmates from CMA's obligations, and Appellant has not demonstrated that any steps were taken toward determining whether CMA would allocate resources to Hall County's jail as required by the agreement in order to bring inmates housed in Hall County under CMA's contractual duties.

In the trial court, Defendants CMA and Dumas pointed to a lack of evidence creating a triable issue as to the question of deviation of the applicable standard of care. Appellant then bore the burden of pointing to evidence giving rise to a triable issue. *Cox Enters.*, supra. Nothing in the testimony cited by Appellant creates a triable issue as to question of whether CMA's contract applied to outsourced inmates, and therefore, as to the element of deviation from the applicable standard of care. We must affirm if the court's order was right for any reason. See *Anderson*, supra.

(b) Appellant contends that regardless of any contractual limitations, CMA and Dumas assumed a duty of care to Hill. We disagree. Appellant cites the Restatement 2d Torts § 324A, arguing that CMA and Dumas are subject to liability to Hill because they undertook to perform the duty of medical and mental health care owed to him by

31

Jackson, or because the harm suffered by Hill was the result of reliance by Jackson or Hill upon CMA's and Dumas's undertaking of the duty owed by Jackson to outsourced inmates. See Restatement 2d Torts § 324A (b) and (c).

As to subsection (b), Appellant provides no evidence that CMA or Dumas undertook the duties that Jackson owed to Hill. Appellant argues that "Dumas was actively involved in communications and decisions regarding the care of Hill while he was in the Hall jail." However, at most, the evidence shows that Dumas was involved in communications about Hill's situation. There is no evidence that Dumas took responsibility for the decisions about Hill, or that Dumas or CMA affirmatively undertook any duty to Hill, while he was in Hall County.

As to subsection (c), there is no evidence that Jackson relied on CMA or Dumas to undertake Hill's care while he was in Hall County. Jackson testified that it was his understanding that non-routine treatment would be provided by the county jail where the inmate was housed, or would be handled by Fulton County if the other county refused to provide it. Moreover, Jackson indicated that he was not familiar with the details of the arrangement between the Hall County jail and the Fulton County jail as to responsibilities for treating a suicidal inmate, and that these matters were handled by others. When asked if Fulton County personnel were responsible for

bringing Hill back for treatment, Jackson responded "[i]t depends on how this was handled between Hall County and Fulton County." Appellant has not demonstrated that Jackson relied on CMA to Hill's detriment.

(c) Appellant further argues that there is a triable issue with regard to this element of her claim because CMA took no steps to care for Hill when he was present at the Fulton County jail on September 16, 2010, the day that he committed suicide. We find this argument to be without merit given the absence of evidence that any agent of CMA was aware of Hill's presence at the Fulton County jail on the date in question.

The court was authorized to grant summary judgment to Dumas and CMA on the grounds that Appellant did not demonstrate a triable issue as to every element of her negligence claim. Given this finding, we need not address Appellant's contention that the court erred in finding that there was no triable issue as to the element of proximate cause. We affirm the grant of summary judgment to Dumas and CMA.

*Judgment affirmed in part, reversed in part. Phipps, P.J., and Boggs, J., concur.*