**THIRD DIVISION**
**DOYLE, P. J.,**
**REESE, J., and SENIOR APPELLATE JUDGE PHIPPS**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**October 11, 2022**

# In the Court of Appeals of Georgia

A22A0658, A22A0683. R. H. v. WAGNER et al.; and vice versa.

PHIPPS, Senior Appellate Judge.

These appeals address whether three high school administrators are protected by official immunity in an action filed by R. H., a former student (the "student"). The trial court granted summary judgment to the administrators, finding, among other things, that although they poorly performed ministerial duties with respect to club approval and review at the high school, they were entitled to official immunity because their poor performance did not rise to a breach of their ministerial duties. In Case No. A22A0658, the student appeals the trial court's grant of summary judgment to the school administrators. In Case No. A22A0683, the administrators cross-appeal the trial court's determination that they engaged in ministerial duties. In the interest of judicial economy, we have consolidated these appeals for review and first address

the school administrators' appeal in Case No. A22A0683 since our holding in that case is dispositive of Case No. A22A0658. For the reasons that follow, we affirm the trial court's grant of summary judgment to the school administrators on the basis of official immunity, but do so on the ground that the county's and school's policies with respect to club approval and regulation were not so definite as to render the administrators' actions or inactions in this case ministerial.

Summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. OCGA § 9-11-56 (c). On appeal from a grant of summary judgment, this Court conducts a de novo review of the legal questions and the evidence, viewing the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmoving party. *Hill v. Jackson*, 336 Ga. App. 679, 680 (783 SE2d 719) (2016); accord *Barnett v. Caldwell*, 302 Ga. 845, 845-846 (I) (809 SE2d 813) (2018). "A grant of summary judgment must be affirmed if it is right for any reason, whether stated or unstated in the trial court's order, so long as the movant raised the issue in the trial court and the nonmovant had a fair opportunity to respond." *Hill*, 336 Ga. App. at 680 (citation and punctuation omitted).

Viewed in the light most favorable to the student, as the nonmovant, the record shows that R. H. was a student at Kell High School in Cobb County from 2014-2018. During her sophomore year (the 2015-2016 school year), Spencer Herron, the video production teacher at Kell High School, initiated an inappropriate relationship with the student that continued through her junior year (the 2016-2017 school year). These encounters began via texting, with Herron obtaining the student's phone number while communicating with members of the school's alleged "drone club." Herron began texting the student inappropriately in 2016, complimenting her and commenting on her appearance and personality. The interactions became physical the summer after the student's sophomore year, when Herron told her to meet him at the school. Herron instructed the student to tell her parents that there was a drone club meeting during the summer as a cover for this encounter.

The sexual interactions continued through the 2016-2017 school year, when the student was a junior. During this time period, Herron would pull the student aside during class or drone club meetings to touch her and talk to her while other students were in the room. Occasionally Herron would tell the student to stay after drone club meeting ended, when the other students left. On one occasion the student met Herron

3

outside the school and he drove them to a hotel. Though they continued texting, the sexual encounters did not continue during the student's senior year.

R. H. first told her mother about the abuse in May 2018 before reporting it to the police, but she never reported it to anyone at Kell High School. Herron was terminated from the Cobb County School District on June 12, 2018, following his arrest for sexual assault.[1]

In July 2019, the student sued Ed Wagner, Andy Bristow, and Dr. Susan Stoddard (collectively "the school administrators"), claiming they were liable for damages she sustained as a result of Herron's abuse. Wagner was the principal at Kell High School for four academic years, from 2012-2016. He left Kell High School before the relationship between the student and Herron became physical. Bristow succeeded Wagner as principal at Kell High School and remained in that position from July 2016 until June 2019. Stoddard was the assistant principal to both Wagner and Bristow, including during the duration of the time that R. H. was a student at Kell High School.

---

[1] Herron is not a party to this litigation, and it is undisputed that he was convicted for and sentenced as a result of his predatory behavior.

4

According to the complaint, Herron unilaterally formed an unapproved and unsupervised school club called the drone club during the 2015-2016 school year, which continued to operate without the school administrators' approval from 2015 through 2017. While it is not clear what exactly R. H. claims the administrators should have done and when they should have done it, the gravamen of the student's theory of recovery is that the administrators' failure to follow administrative steps to properly approve, regulate, and disband the drone club permitted Herron to use the club to repeatedly sexually assault the student, resulting in her harm. The student does not allege that the school administrators knew about her inappropriate relationship with Herron before she reported it to the police. The school administrators answered the complaint, asserting, among other defenses, the doctrine of official immunity.

With respect to school clubs at Kell High School, the evidence adduced during discovery shows that Bristow used an "interpretation of [his] job duties and descriptions" as principal to designate the oversight of club responsibilities to Stoddard as his assistant principal. Stoddard also had oversight responsibility for clubs during at least the last year that Wagner was principal (2015-2016). Part of this responsibility entailed reviewing club applications. Club formation at Kell High

5

School involved submitting a required application, which asked for the club name, sponsor, mission, members, meeting times, and dues. A submitted application would be reviewed first by Stoddard, and then by the principal and a larger administration team. Ultimately, however, whether to approve the application was "a discretionary decision . . . up to [the principal's] best judgment." According to Bristow, if no application was submitted, then there was no official school-authorized club.

This being said, Stoddard testified in a deposition that the application procedure "was put in place just to help [them] keep track of the clubs," and she suggested that a club potentially could switch names without going through the entire application process. According to Herron, "if I may be cavalier, after being there for so long, things that we did sometimes were just — it's okay to do that; it's not okay to do this." For instance, during an August 2017 email exchange, Herron informed Stoddard that the drone club had "turned into" a film club, and Stoddard seemed to accept this information, stating that she would "add it to the [club] list." Stoddard also testified that students often stayed after school to participate in activities or receive tutoring from a teacher, and this type of activity was not considered a "club."

The school administrators also differed somewhat regarding what would happen if it was discovered that a club did not go through the approval process.

6

Bristow testified in a deposition that there was no written policy regarding unapproved clubs, but if one were discovered, either he or Stoddard would discuss it with the teacher and tell the teacher to fill out an application so the club could become official. Wagner testified that an unapproved club would have been shut down. Stoddard, on the other hand, as mentioned above, described a process through which clubs sometimes switched names and did not go through a new application process.

It is undisputed that Herron was the video production teacher at Kell High School for 16 years and that students often worked on projects in his classroom before, during, and after school. Several years prior to the incident at issue, Herron had submitted a club application for a video production club. According to Herron, he started the drone club due to student interest in learning how to use drones for video production. Herron testified in a deposition that the drone club was in existence in October 2015, though he was aware that the club likely "wasn't on record with the school" because the video production club just changed its name to the drone club.

Herron also testified that drone club members did not pay any dues; instead he used the video production club account to fund any purchases, which included a drone. According to Herron, the drone club ceased operating in the spring of 2017

7

when members stopped attending meetings, and by August 2017, the drone club had transitioned to the film club, though, according to Bristow, Herron had not followed the proper procedure for doing so. R. H. joined the drone club her sophomore year and continued in the club through her senior year, even after it turned into the film club.

Wagner, Bristow, and Stoddard all deny the existence of a school-approved drone club at Kell High School. As stated previously, for a club to be officially recognized at the high school, the sponsor was required to submit an application to be reviewed and accepted by the administrative team. The record does not contain any evidence that Herron submitted a formal application for the drone club to Stoddard. Accordingly, while the school administrators may have had some general knowledge of the drone club, it appears to be undisputed that it was not an official school-approved club.

Following discovery, the school administrators moved for summary judgment on the bases that the student's claims (a) were barred by official immunity because they did not engage in any ministerial duties with respect to the approval or regulation of the drone club and its activities, and (b) failed due to a lack of proximate causation. The trial court granted the administrators' motion on both grounds. With respect to

8

official immunity, the court initially concluded that because the school administrators "knew of the existence of activities commensurate with a Drone Club and did not take steps to establish the Drone Club in a manner consistent with Cobb School Board Policy JHC-R,"[2] Stoddard "negligently performed the ministerial duty delegated to her by . . . Wagner and Bristow to review and approve the establishment [of] on campus student clubs." However, the court subsequently made the contrary conclusion that Stoddard's "poor performance of the ministerial duty [did] not rise to negligent performance" sufficient to constitute a breach of that ministerial duty.[3] The court further found that even if the school administrators did breach a ministerial duty, the student failed to demonstrate a causal link between that breach and the harm she sustained. These appeals followed.

*Case No. A22A0683*

---

[2] See Division 1, below.

[3] As addressed more fully in Division 1, the trial court's finding that Stoddard's "poor performance of the ministerial duty [did] not rise to negligent performance" would be sufficient to support a conclusion that the school administrators were entitled to official immunity. See *Barnett*, 302 Ga. at 847-848 (II). However, the court's additional finding that Stoddard "negligently performed the ministerial duty delegated to her by . . . Wagner and Bristow to review and approve the establishment [of] on campus student clubs," would not support the application of official immunity to the school administrators. See id.

1. The school administrators contend that the trial court erred in determining that Stoddard engaged in ministerial duties (delegated to her by Wagner and Bristow) with respect to the formation and operation of school clubs at Kell High School. According to the administrators, they are entitled to official immunity not because Stoddard poorly performed ministerial duties, but because the issues of club approval and regulation at Kell High School involved discretionary duties. We agree.

Whether the school administrators can be held liable for an alleged violation of the county's or school's policies on the approval and regulation of school clubs turns on the doctrine of official immunity. The basis for official immunity originates in Ga. Const. of 1983, Art. I, Sec. II, Par. IX (d), which states in part:

> [A]ll officers and employees of the state or its departments and agencies may be subject to suit and may be liable for injuries and damages caused by the negligent performance of, or negligent failure to perform, their ministerial functions and may be liable for injuries and damages if they act with actual malice or with actual intent to cause injury in the performance of their official functions. Except as provided in this subparagraph, officers and employees of the state or its departments and agencies shall not be subject to suit or liability, and no judgment shall be entered against them, for the performance or nonperformance of their official functions. . . .

10

This doctrine protects public employees, such as teachers, from being subjected to suit or liability unless they (1) negligently perform a ministerial duty or (2) act with malice or intent to harm when performing a discretionary duty. *Barnett*, 302 Ga. at 847-848 (II); accord *Austin v. Clark*, 294 Ga. 773, 774 (755 SE2d 796) (2014). We note at the outset that the student in this case does not allege that the school administrators acted with malice or intent to harm; therefore, the administrators' liability in this case hinges on whether their alleged actions or inactions — specifically with respect to approving, regulating, or potentially disbanding school clubs at Kell High School — constituted a negligent performance of a ministerial duty. Compare *Barnett*, 302 Ga. at 847-848 (II), with *Harper v. Patterson*, 270 Ga. App. 437, 440 (2) (606 SE2d 887) (2004) ("[P]ublic officials are immune from damages that result from their performance of discretionary functions, unless those functions were undertaken with malice or intent to cause injury.") (citation and punctuation omitted).

Whether an action is ministerial or discretionary centers on "the character of the specific actions complained of, not the general nature of the job, and is to be made on a case-by-case basis." *McDowell v. Smith*, 285 Ga. 592, 594-595 (678 SE2d 922) (2009) (citation and punctuation omitted).

11

A ministerial act is commonly one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty. A discretionary act, however, calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed.

*Murphy v. Bajjani*, 282 Ga. 197, 199 (1) (647 SE2d 54) (2007) (citations and punctuation omitted); accord *Barnett*, 302 Ga. at 848 (II); *Harper*, 270 Ga. App. at 440 (2). "[T]he important question in the context of official immunity is not merely whether [the school administrators] owed a duty of care, but rather, whether [they] owed a duty that is particularized and certain enough to render [their] duty a ministerial one." *Barnett*, 302 Ga. at 848 (II) (citation and punctuation omitted).

A ministerial duty can be established in a number of ways, including by written or unwritten policy, a supervisor's directive, or statute. See *Hill*, 336 Ga. App. at 684 (1) (a). However, to establish a ministerial duty, the policy or directive — whether written or unwritten — must be "clear, definite, and certain as to merely require the execution of a specific, simple, absolute, and definite duty, task, or action in a specified situation without any exercise of discretion." *Barnett*, 302 Ga. at 848 (II). Accordingly, "even when an [administrator] clearly owes a duty of care and is

12

absolutely required to do *something*, unless she has been commanded — by law or by the policy or directive of her employer — to do a *particular thing*, she still is engaged in the performance of a discretionary function." *Barnett*, 302 Ga. at 848-849 (II) (citation and punctuation omitted; emphasis in original).

> When a party moves for summary judgment on the basis of qualified immunity,[4] that party bears the burden of establishing that he was entitled to the protection of said immunity. Once this burden is carried and this prima facie showing is made, the burden to produce evidence shifts to the nonmoving party to come forward with rebuttable evidence sufficient to show that a genuine issue of fact exists with regard to whether the defendant breached a ministerial duty.

*Hill*, 336 Ga. App. at 684 (1) (a) (citation omitted).

With these guiding principles in mind, we turn to the ultimate issue in this case: Whether the approval, regulation, or potential disbanding of clubs at Kell High School involved ministerial or discretionary duties. R. H. argued below, as she does on appeal, that Cobb County District Administrative Rule JHC-R required the school administrators "to perform certain tasks, many administrative, [that] are black and

---

[4] "[T]he terms 'official immunity' and 'qualified immunity' are used interchangeably in Georgia case law to refer to the type of immunity that sometimes shields government employees from individual liability[.]" *Hill*, 336 Ga. App. at 683 (1), n. 3.

white and nondiscretionary."[5] Without analyzing the particular facts in this case, the trial court concludes in its order that the language of Rule JHC-R "is clear as it pertains to the establishment of student clubs," and the court (i) implicitly finds that the approval and regulation of school clubs at Kell High School involved the exercise of ministerial duties, and (ii) explicitly finds that Stoddard either "negligently" or "poor[ly]" performed these ministerial duties because she "did not take steps to establish the Drone Club in a manner consistent with [Rule] JHC-R." We disagree with the trial court's conclusion that any potential duties here were ministerial.

Rule JHC-R addresses school clubs and organizations; however, the record does not support the trial court's finding that the policy expressed in the rule "is clear as it pertains to the establishment of student clubs" or the student's assertion that the policy "mandate[s] a process for reviewing and approving of school clubs." The rule merely defines school clubs in general terms and states where information about school clubs may be disseminated. According to the rule, clubs are "under the sponsorship, direction and control of the school," and "[t]he Principal shall assign

_____

[5] The record includes copies of Rule JHC-R, the district administrative rule addressing school clubs and student organizations, for 2013, 2016, and 2017. The rules for each year are virtually identical with respect to the issues relevant to these appeals, and the parties do not argue that any other rules apply in this case.

14

faculty members to sponsor and coordinate activities of school clubs." The remainder of the rule is focused on the privileges afforded to clubs, as well as parent/guardian consent. With the exception of excluding "religious, political, or philosophical beliefs" from "school clubs," the rule does not (a) specify details regarding the process for assigning faculty members to sponsor a club or (b) provide any guidance or directives about the formation or regulation of clubs. In fact, in regards to the formation of clubs, the rule does not once use the words "approval," "review," "regulation," or "application." Additionally, absolutely no reference is made to unofficially operating clubs and the process for disbanding these clubs.

As stated above, to establish a ministerial duty, a policy must be "clear, definite, and certain," *Barnett*, 302 Ga. at 848 (II), which has been described as "simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty." *Murphy*, 282 Ga. at 199 (1) (citation and punctuation omitted). Rule JHC-R does not meet these standards with respect to school club approval or regulation. Rather than establishing any clear policies that must be followed by school administrators, the rule simply addresses the existence of clubs and organizations generally, leaving open for personal judgment and interpretation the approval, regulation, or potential disbanding of clubs.

15

Accordingly, this written rule does not impose any duties with respect to R. H.'s claims against the administrators in this case, let alone support a finding that the approval, regulation, or disbanding of school clubs at Kell High School involved ministerial duties. See *Barnett*, 302 Ga. at 849 (II) (finding that a written policy did not establish a ministerial duty because it offered no specificity and did not require an absolute or definite duty regarding student supervision); *Grammens v. Dollar*, 287 Ga. 618, 620-621 (697 SE2d 775) (2010) (finding that because a written policy did not define a term, it required a teacher to engage in a discretionary act).

To circumvent the lack of an explicit written policy regarding club approval and regulation at Kell High School, the student also argues on appeal, as she did below, that "unwritten" school rules regarding these procedures created ministerial duties. Although "[u]nwritten policies can establish ministerial duties where they require specific action under specific circumstances," *Hill*, 336 Ga. App. at 688 (2) (a) (i), the student has failed to demonstrate the existence of ministerial duties created by unwritten policies at Kell High School regarding the approval, regulation, or potential disbanding of school clubs. According to the student, the question of how to perform any duty with respect to the approval and review of school clubs is not at issue, but, rather, the issue is "whether several check-the-box tasks were even **done**."

16

However, the student has failed to point to any evidence in the record demonstrating that Kell High School had "clear, definite, and certain" "check-the-box tasks" for approving, regulating, or disbanding school clubs.[6] See *Barnett*, 302 Ga. at 848 (II).

According to the school administrators, prospective clubs at Kell High School were required to have a sponsor who completed an application that was subsequently reviewed by the assistant principal. For the relevant time period, club applications were first directed to Stoddard and then to the principal for final approval. R. H. identifies no evidence in the record that Wagner or Bristow received any written or unwritten directives other than Rule JHC-R regarding Kell High School club formation, regulation, or potential disbanding. In addition, other than broadly delegating club responsibilities to Stoddard, R. H. identifies no evidence that Wagner or Bristow gave Stoddard any specific directives, written or unwritten, regarding how and when to approve, regulate, or potentially disband clubs.

---

[6] The student includes yearly reviews of club budgets and activity reports in her recitation of unwritten school rules that required established ministerial duties. Bristow agrees that these reports were mandatory and explains that they were given to Stoddard to read and keep on file. However, Stoddard denies their existence altogether, and R. H. does not provide any policies or directives for reviewing these documents. Pretermitting whether any ministerial duty arose regarding the review of these documents, it appears to be undisputed that the drone club was not an official school-approved club and would not have submitted any official activity reports or budgets for review.

17

The student argues that because the process Stoddard was required to perform involved a duty to complete a specific task — "namely to approve every school club and shut down any unauthorized clubs" — the process involved ministerial duties. We disagree for several reasons. As stated previously, a ministerial act is "simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty." *Murphy*, 282 Ga. at 199 (1) (citation and punctuation omitted). First, R. H. has failed to identify any clearly established, unequivocal mandate requiring Stoddard to execute a specific duty with respect to the approval of school clubs. Second, R. H. has failed to identify any clearly established, unequivocal mandate requiring the administrators to discover the existence of unauthorized clubs. To the extent that R. H. claims that the school administrators had a duty to do "something" about the unapproved drone club if and when they learned of its existence, R. H. has identified no clearly established, unequivocal mandate (either ministerial or discretionary) that the administrators do whatever that "something" is. For example, R. H. has failed to show that the existence of certain administrative prerequisites to club formation at Kell High School, standing alone, automatically require the administrators to immediately shut down any club upon discovery that all of the prerequisites have not been satisfied.

18

Although the school administrators' explanations of the process by which Kell High School clubs were approved, regulated, and potentially disbanded provide some "direction regarding the school's expectations," the process as explained above is "not enough to render the otherwise general policy sufficiently specific and definite." *Barnett*, 302 Ga. at 849 (II). In fact, the testimony of the school administrators indicates that they viewed the process differently,[7] thus demonstrating that any unwritten policies at Kell High School required them to "exercise . . . personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed." *Murphy*, 282 Ga. at 199 (1) (citations and punctuation omitted). Moreover, while one or more of the administrators, at times, testified that this or that "should" have happened, whether something "should" have happened is a separate question from whether there was a clearly established duty for any of the administrators to have done something

---

[7] Stoddard testified in a deposition that although Bristow may have believed a club could not just change its name without providing a new application, she believed a new application was necessary only if the club's mission changed. In addition, Bristow testified that if the school realized an unofficial club had been formed, administrators would talk to the teacher and have him or her fill out an application. Stoddard, on the other hand, testified that students often stayed after school to work with a teacher on projects, and she recognized it as tutoring rather than the operation of an unofficial club.

19

in particular. To the extent that any such obligations existed, they were, at most, discretionary.

The student cites *Wanless v. Tatum* for the proposition that an action required by an established policy or directive is ministerial, "even though the manner in which it is accomplished is left to the employee's discretion." 244 Ga. App. 882, 883 (536 SE2d 308) (2000) (citation and punctuation omitted). However, that case is inapposite. In *Wanless*, a citizen called a county roads and drainage department to complain about traffic speed on a particular road. Id. 883. An established policy required the department to record and investigate any citizen complaints, but the complaint at issue was neither recorded nor investigated. Id. This Court concluded that although the department employee may have had discretion regarding when to conduct an investigation, the policies of writing up the complaint and investigating it were ministerial, and summary judgment on the basis of official immunity was not warranted given the material issues of fact regarding whether the employee received a complaint and properly followed up on it. Id. at 884.

The case at hand differs from *Wanless* primarily because no specific act was required by the school administrators. It is uncontested that no formal club application was submitted. Accordingly, the school administrators were not required

20

to approve of or review a club that was never proposed. In addition, even if R. H. could prove that the three Kell High School administrators knew about the un-official drone club, R. H. has failed to point to any evidence of a clear, unequivocal mandate that administrators shut down the un-approved club. Quite simply, Kell High School had no "clear, definite, and certain [policy] as to merely require the execution of a specific, simple, absolute, and definite duty, task, or action in a specified situation without any exercise of discretion" with respect to the shutting down of unapproved clubs. *Barnett*, 302 Ga. at 848 (II). As stated previously, "even when an [administrator] clearly owes a duty of care and is absolutely required to do *something*, unless she has been commanded — by law or by the policy or directive of her employer — to do a *particular thing*, she still is engaged in the performance of a discretionary function." Id. at 848-849 (II) (citation and punctuation omitted; emphasis in original).

The club approval, regulation, and potential disbanding process described by the school administrators in this case leaves open plenty of opportunity for interpretation and discretion. While there was a process in place for such actions, there were no simple, specified duties with regard to the approval process, no formal guidelines regarding how to review applications or activity reports, no rules about

21

when or how to disband clubs that failed to submit applications, and no guidelines or rules so clearly and precisely defined so as to create ministerial duties for the school administrators. In short, any unwritten policies or directives presented no specific circumstance that triggered a mandatory action. See *Hill*, 336 Ga. App. at 687 (1) (a) (ii); see also id. at 688 (2) (a) (i) ("Unwritten policies can establish ministerial duties where they require specific action under specific circumstances."). The responsibility of approving, regulating, or potentially disbanding clubs appears to be entirely within the purview of Stoddard and the administration team. In fact, Bristow's designation of club responsibilities to Stoddard was itself a discretionary interpretation of job duties.

Here, neither the text of Rule JHC-R nor any unwritten policies for the approval, regulation, or disbanding of Kell High School clubs created a duty sufficiently unequivocal to qualify as ministerial. See *Barnett*, 302 Ga. at 848 (II). Accordingly, the school administrators, and Stoddard specifically, were required to exercise personal deliberation and judgment in determining whether to approve a club, how to review or regulate a club, and what to do with an unofficial club, which means they performed discretionary duties. See id. That is not to say that there could never be a policy on the approval, regulation, or disbanding of school clubs so

22

definite as to render a school administrator's acts ministerial. Cf., e.g., *McDowell*, 285 Ga. at 593 (finding a school receptionist's duties were ministerial where the school check-out procedure was "hard and fast[,]" provided no exceptions, and "explicitly allowed for no discretion"); *Hill*, 336 Ga. App. at 684-686 (1) (a) (i) (finding a sheriff's employee's duties were ministerial because prescribed tasks regarding suicide watch were "simple, absolute and definite tasks that must be performed"). However,

> [a]s a court, the wisdom of an employee's conclusion is not the question we evaluate; instead, we are tasked with discerning whether the employee had a range of options to choose from based on her own judgment. And in a situation where an official has that sort of discretion, the official is shielded from personal liability for the choices she makes, even if they are poor ones, so long as the official does not act with actual malice or intent to cause injury.

*Barnett*, 302 Ga. at 850 (II).

In this case, the county's and Kell High School's general policies regarding school clubs are not so definite as to render the school administrators' judgment regarding the approval, regulation, or disbanding of clubs, such as the drone club, ministerial. And because it is undisputed that any discretionary duties were not performed with malice or intent to harm, the school administrators in this case are

23

entitled to official immunity. See *Barnett*, 302 Ga. at 847 (II); *Austin*, 294 Ga. at 774. Accordingly, we affirm the trial court's grant of summary judgment to the school administrators on the basis of official immunity.

*Case No. A22A0658*

2. The student asserts in this appeal that the trial court erred in granting summary judgment to the administrators because (a) official immunity does not apply since the school administrators negligently performed ministerial acts, and (b) a reasonable jury could have found that the administrators' negligent oversight of the drone club allowed Herron to maintain an inappropriate relationship with and therefore harm the student. However, our holding in Division 1 that any acts, or failures to act, by the school administrators in approving, regulating, or potentially disbanding clubs at Kell High School involved discretionary duties forecloses the student's argument that official immunity does not apply in this case. Furthermore, based on this conclusion, we need not address the student's argument that the trial court erred in finding that she failed to prove proximate cause between the administrators' actions or inactions and her harm, and we express no opinion on that finding.

*Judgments affirmed. Doyle, P. J., and Reese, J., concur.*